United States District Court
Southern District of Texas
**ENTERED**
August 04, 2016
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| ILDA IRENE AGUILAR, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 2:15-CV-87 |
| | § | |
| CAROLYN W COLVIN, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND RECOMMENDATION

Plaintiff Ilda Aguilar brought this action on February 13, 2015, seeking review of the Commissioner's final decision determining she was not disabled.  (D.E. 1).  On September 18, 2015, Plaintiff filed a Brief in Support of Claim.  (D.E. 14).  On November 2, 2015, Defendant filed a Responsive Brief.  (D.E. 15).  For the reasons that follow, it is respectfully recommended that the Commissioner's determination be **AFFIRMED** and Plaintiff's cause of action be **DISMISSED**.

## I.  JURISDICTION

The Court has jurisdiction over the subject matter and the parties pursuant to 42 U.S.C. § 405(g).

## II.  ISSUE PRESENTED

Plaintiff contends the ALJ's residual functional capacity ("RFC") finding is not supported by substantial evidence.  (D.E. 14).

## III.  BACKGROUND

Plaintiff protectively filed her applications for disability insurance benefits and supplemental security income on July 12, 2012, alleging disability as of August 1, 2011, due to knee, hand and back ailments.[1]  (D.E. 12-6, Pages 1-16 and D.E. 12-7, Pages 9, 34, and 66).

Plaintiff's application was denied upon initial consideration and was again denied upon reconsideration.  (D.E. 12-4, Pages 2-5 and D.E. 12-5, Pages 2-9, 14-19).  At Plaintiff's request, a hearing was held before an administrative law judge ("ALJ") on June 2, 2014 at which Plaintiff, a medical expert and a vocational expert ("VE") testified. (D.E. 12-3, Pages 27-56).  The ALJ issued an unfavorable decision on July 22, 2014, finding Plaintiff not disabled.  (D.E. 12-3, Pages 7-22).  Plaintiff requested the Appeals Council review the ALJ's decision, and the Appeals Council denied her request for review on October 31, 2014, making the ALJ's determination the final decision of the Commissioner under 42 U.S.C. § 405(g).  (D.E. 12-3, Pages 2-5).  Plaintiff timely filed this action on December 30, 2014, seeking a review of the Commissioner's final decision. (Case No. 2:14-mc-1336, D.E. 1).

## IV.    SUMMARY OF THE EVIDENCE

The undersigned has reviewed all of Plaintiff's treatment notes in the record. However, only those relevant to the pending issues raised in the petition are included below.  Plaintiff, at the time her application was filed, was a 53 year old woman with a

---

[1]Plaintiff does not dispute the findings regarding any mental limitations and/or mental impairments in this action.  (D.E. 1 and D.E. 14).  Therefore, the undersigned references only those records and arguments dealing with Plaintiff's physical impairments.

seventh grade education[2] and past relevant work as a housekeeping cleaner.  (D.E. 12-3, Page 54 and D.E. 12-7, Pages 4-10).  Plaintiff reported she stopped working on August 1, 2011 because of "knee and hand problems."  (D.E. 12-7, Pages 9-10).

On March 19, 2011, Plaintiff was treated at Christus Spohn Memorial Hospital ("Memorial") for a rash and fever.  (D.E. 12-10, Page 37).  Plaintiff is noted as ambulatory and having generalized pain with exercise/activity.  (D.E. 12-10, Pages 39-40).  Plaintiff reported she did not have a history of falls and did not use an ambulatory aid.  (D.E. 12-10, Page 39).

On October 31, 2011, Plaintiff was treated by Dr. Jorge Ramirez reporting chest pains, numbness in her left hand, and pain in her bones.  (D.E. 12-9, Pages 26-27).  Plaintiff reported her bone pain, mainly in her hands, elbows and knees, was worse in the morning and "gets better throughout the day."  (D.E. 12-9, Page 27).  She reported over the counter pain medication did not help with the pain.  (D.E. 12-9, Page 27).  Labs were ordered to determine whether the source of Plaintiff's joint pain could be osteoarthritis or rheumatoid arthritis ("RA vs OA") and Plaintiff was prescribed Tylenol Arthritis.  (D.E. 12-9, Pages 27-28).

On November 16, 2011, Plaintiff was treated by Dr. Marie Martinez for a follow up reporting arthritis pain in her hands, neck and back.  (D.E. 12-9, Page 24).  Plaintiff reported she forgot to have her labs drawn.  (D.E. 12-9, Page 24).  Plaintiff is noted as healthy-appearing, ambulating normally, having normal motor strength and tone and

---

[2]Plaintiff testified at a June 2, 2012, hearing that she completed sixth grade.  (D.E. 12-3, Page 31).

normal movement of all extremities.  (D.E. 12-9, Page 25).  An x-ray of Plaintiff's spine was ordered because of Plaintiff's chronic neck and back pain.  (D.E. 12-9, Pages 25-26). On November 30, 2011, x-rays indicated a normal cervical, lumbar and thoracic spine. (D.E. 12-8, Pages 15-17).[3]

On December 15, 2011, Plaintiff was treated by Dr. Martinez for abdominal pain. (D.E. 12-9, Page 21).  Plaintiff also reported continued "pain with bones."  (D.E. 12-9, Page 21).  Plaintiff was noted as healthy-appearing with no exercise intolerance and ambulating normally.  (D.E. 12-9, Page 23).  Further, Plaintiff had normal tone and motor strength and normal movement of all extremities.  (D.E. 12-9, Page 23).  A CT of Plaintiff's abdomen was ordered as well as associated lab work and she was referred to physical therapy three times a week for eight weeks for her chronic back pain.  (D.E. 12-9, Page 23).

On January 16, 2012, Plaintiff was treated by Dr. Martinez for a follow-up of her CT and lab results.  (D.E. 12-9, Page 19).  Plaintiff was noted as healthy-appearing with no exercise intolerance and ambulating normally.  (D.E. 12-9, Page 20).

On May 31, 2012, Plaintiff was treated by Dr. Jennifer Nguyen reporting knee pain, especially in the left, for the past month.  (D.E. 12-9, Pages 15-18).  Plaintiff reported her knees would give out and her left knee pain was moderate, throbbing and sharp and was aggravated by walking.  (D.E. 12-9, Page 16).  Plaintiff is noted as

---

[3]Specifically, the x-rays showed an "unremarkable cervical spine series [with] [n]ormal alignment and no acute fractures," "normal alignment [and] [n]o acute fractures of the lumbar spine," and "unremarkable three views of the thoracic spine" with "normal alignment of the vertebral bodies and no acute fractures."  (D.E. 12-8, Pages 15-17).

healthy-appearing with limited ambulation and tenderness in her left knee with no swelling.  (D.E. 12-9, Pages 17-18).  Plaintiff was prescribed Naproxen for her knee pain and an x-ray was ordered of her left knee.  (D.E. 12-9, Pages 16 and 18).  Dr. Nguyen noted she believed Plaintiff "may have torn meniscus" and may need an MRI and steroid injection.  (D.E. 12-9, Page 18).

On June 5, 2012, Dr. Jon Watson reviewed Plaintiff's left knee x-ray and noted there was no evidence of acute fracture or dislocation but it did indicate a "loss of joint space in the medial compartment suggesting osteoarthritis."  (D.E. 12-8, Page 11).

On June 28, 2012, Plaintiff was treated by Dr. Crystal Garza for left knee pain.  (D.E. 12-9, Pages 12-14).  Plaintiff reported no associated weakness, numbness, tingling, buckling, or swelling.  (D.E. 12-9, Page 13).  Plaintiff is noted as healthy-appearing and as "ambulates with no assistive devices, no limp and normal gait."  (D.E. 12-9, Page 14).  Both of Plaintiff's knees are noted as appearing normal with normal active and passive range of motion.  (D.E. 12-9, Page 14).  Plaintiff is further noted as having tenderness in her left knee.  (D.E. 12-9, Page 14).  Plaintiff received a cortisone injection in her left knee and was scheduled for a follow-up in thirty days.  (D.E. 12-9, Page 14).

On July 31, 2012, Plaintiff was treated by Dr. Juan Davila for a follow-up on her lower leg pain, bilateral knee pain and bilateral wrist pain.  (D.E. 12-9, Page 9).  Plaintiff reported her knee pain was moderate with the worst pain at an 8.  (D.E. 12-9, Page 9).  She further reported her knee pain was aggravated by putting weight on her knees, nighttime and cold weather.  (D.E. 12-9, Page 9).  Plaintiff also stated she had weakness and numbness in her left knee as well as swelling and she was prone to buckling and

instability.  (D.E. 12-9, Page 10).  Plaintiff is noted as healthy-appearing, walking with a limp and having right knee swelling and no deformity in her left knee and tenderness and pain in both.  (D.E. 12-9, Page 11).  Plaintiff was referred to physical therapy and an orthopedist and was prescribed Ultram for her joint and leg pain.  (D.E. 12-9, Page 12 and 12-10, Pages 10-11).

On August 2, 2012, Plaintiff was treated by a physical therapist.  (D.E. 12-10, Page 15).  Plaintiff reported her pain began approximately five months earlier with an unknown cause.  Plaintiff further reported her pain level was a 4 at rest and 7 with activity, with cold weather as an aggravating factor.  Plaintiff is noted as having an antalgic gait (gait developed as a way to avoid pain while walking) and stance.  (D.E. 12-10, Page 15).  The physical therapist noted Plaintiff would benefit from skilled physical therapy to improve her knee strength and stability and to reduce her pain to increase her functioning.  The physical therapist further noted Plaintiff's rehabilitation potential was good.  (D.E. 12-10, Page 16).  Plaintiff was noted had continuing problems of "decreased strength, gat and pain" and it was recommended she use a straight cane.  (D.E. 12-10, Page 18).  However, Plaintiff was discharged from physical therapy on August 20, 2012 for poor attendance.  (D.E. 12-10, Pages 18-20).  The record indicates Plaintiff was having "significant reduction in pain after three visits, before not showing up for her appointments." (D.E. 12-10, Pages 18 and 20).[4]

---

[4]Plaintiff's pain pre-treatment on August 2, 2012 is noted as a 7 and her post treatment pain is noted as a 3.  (D.E. 12-10, Pages 20-21).  On August 3, 2012, her pre-treatment pain is noted as a 2 and her post-treatment pain is noted as a 0.  (D.E. 12-10, Page 22).  Plaintiff is noted as having an antalgic gait.  (D.E. 12-10, Page 22).  On August 6, 2012, Plaintiff's pain pre-treatment is

On August 14, 2012, Plaintiff completed a function report indicating she lived in an apartment with her grandson, could not pick up a plate or glass without dropping it and could not stand for a long time or walk a long distances over a half of a block without her legs giving out.  (D.E. 12-7, Pages 34-35).  Plaintiff reported she and her grandson took care of one another and together they cleaned the house and cooked each day.  (D.E. 12-7, Pages 35-36).  Plaintiff further indicated she could not sleep because of the pain in her legs and she had to use a chair in the shower.  (D.E. 12-7, Page 35).  She also reported she shopped once a month for groceries and did not drive.  (D.E. 12-7, Pages 36-38).  As part of the work history reported completed the same day, Plaintiff reported her housekeeping position required her to lift and carry up to 50 pounds, 25 pounds frequently.  (D.E. 12-7, Page 45).

On September 20, 2012, Plaintiff was treated at Memorial with a chief complaint of a rash which resulted after she received an injection in her left knee.  (D.E. 12-10, Pages 3-7).  Plaintiff had previously been told to take Benadryl but she reported it was not working.  (D.E. 12-10, Page 5).  Plaintiff is noted as ambulatory and was given medication to treat the rash.  (D.E. 12-10, Pages 5 and 7).

On September 24, 2012, Plaintiff was treated by Dr. Jorge Ramirez with a chief complaint of a rash related to an injection she received for treatment of knee pain.  (D.E. 12-9, Pages 6-9).  Plaintiff is noted as having a normal range of motion in her right knee

---

noted as a 1 and post-treatment pain is noted as a 3.  (D.E. 12-10, Pages 20 and 23).  Plaintiff reported her knee pain was "a lot better now, it doesn't hurt that much today."  (D.E. 12-10, Page 23).  Plaintiff did not show up for her appointments on August 9, 13 or 16, 2012 and physical therapy was then discontinued due to non-compliance.  (D.E. 12-10, Page 20).

and left knee with mild impairments as well as normal ambulation with no assistance. (D.E. 12-9, Page 8).   Plaintiff was prescribed Ultram for her joint and leg pain and she again received treatment for her rash.   (D.E. 12-9, Page 8).

On October 11, 2012, Dr. Francisco Acebo performed a consultative examination, noting Plaintiff's chief complaint was arthritis.   (D.E. 12-8, Pages 19-22).   Plaintiff reported she had severe arthritis in her knees and her knees had gotten worse over the past few months and she could walk about a block.   Plaintiff also reported she had bilateral carpal tunnel for years which caused numbness and pain in her hands.   (D.E. 12-8, Page 9).   Plaintiff indicated she did not drink, smoked three cigarettes a day and had no illegal drug use.   (D.E. 12-8, Page 19).   Dr. Acebo noted Plaintiff was alert and oriented and in no distress with a poor gait.   (D.E. 12-8, Page 20).   He further noted no joint erythema, crepitus or swelling.   X-rays taken the same day found a normal left knee. (D.E. 12-8, Pages 20 and 22).   Dr. Acebo further noted that "[g]iven the degree of discomfort [reported in her knees] one must wonder if she has some type of internal derangement of the meniscus or ligaments."   (D.E. 12-8, Page 20).   X-rays of Plaintiff's hands, also taken the same day, were normal except for mild primary arthritis.   Dr. Acebo noted Plaintiff had a positive Tinel sign[5] on her left wrist during his examination and that he "suspect[ed] her symptoms are indeed related to carpal tunnel syndrome."   (D.E. 12-8, Pages 20-21).

---

[5]Tinel's sign is positive when lightly banging over the nerve elicits a tingling, or 'pins and needles,' in the distribution of the nerve. For example, in carpal tunnel syndrome, where the median nerve is compressed at the wrist, the test for Tinel's sign is often positive. http://www.medicinenet.com/script/main/art.asp?articlekey=16687

On November 21, 2012, Plaintiff was seen for a consultative mental examination where she reported she drove herself to the evaluation.  (D.E. 12-8, Page 24).[6]  Plaintiff is noted as walking with a visible limp.  (D.E. 12-8, Page 24).  Plaintiff reported she cares for her daily grooming and it was difficult for her to assist with household chores because of her physical limitations.  (D.E. 12-8, Page 26).  Plaintiff reported she had a history of cocaine abuse but had been sober for five years.  (D.E. 12-8, Page 26).  Plaintiff is noted as being "concerned with not being able to work."  (D.E. 12-8, Page 27).

On December 10, 2012, Dr. Yvonne Post completed a physical RFC and her diagnosis was left knee pain and carpal tunnel syndrome.  (D.E. 12-8, Page 31).  Dr. Post opined Plaintiff could occasionally lift and/or carry 20 pounds, frequently lift 10 pounds, stand and/or walk about six hours in an eight hour workday, sit with normal breaks for six hours in an eight hour workday, push or pull without limitation, occasionally climb ramps or stairs but never ladders, ropes or scaffolds and could frequently balance and stoop and occasionally kneel, crouch and crawl.  (D.E. 12-8, Pages 32-33).  Dr. Post further opined Plaintiff had no manipulative limitations.  (D.E. 12-8, Page 34).

On December 11, 2012, Plaintiff's claim for benefits was initially denied.  (D.E. 12-5, Page 4).

Over one year later, on December 21, 2013, Plaintiff was treated for a rash and kidney pain by Dr. Juan Davila.  (D.E. 12-8, Page 62).  Plaintiff reported chronic back pain that was relieved by changing positions and aggravated by movement.  (D.E. 12-8,

---

[6]At the June 2, 2014 hearing before the ALJ, Plaintiff testified this was a mistake because her friend drove her everywhere and she did not drive. (D.E. 12-3, Page 34).

Page 62).   Plaintiff reported no weak limbs, no numbness in her legs or feet and no tingling.   (D.E. 12-8, Page 62).   Plaintiff is noted as healthy-appearing, ambulating normally, with normal motor strength and tone, and normal movement of all extremities. (D.E. 12-8, Page 64).   Plaintiff was noted as "jump[ing] and yell[ing] to the mildest palpation of the skin along the spine" making it "difficult to exam[ine] the spine thoroughly."   (D.E. 12-8, Page 65).   Plaintiff was further noted as reporting difficulty walking "even though patient had just been ambulating without assistance in the examining room during the interview."  (D.E. 12-8, Page 65).   Dr. Davila emphasized to Plaintiff "the importance of exercising and doing appropriate physical therapy consistently to help resolve the pain in her back."   (D.E. 12-8, Page 65).   Plaintiff was prescribed Ultram for her lower leg pain and exercises for her hand arthritis.  (D.E. 12-8, Page 65).

On February 1, 2013, William Boostrom, P.A., ("P.A. Boostrom") treated Plaintiff to establish care.  (D.E. 12-8, Page 76).   Plaintiff's chief complaint was osteoarthritis in her knees and bilateral knee pain.  Plaintiff reported ongoing joint pain.  Plaintiff reported she smoked 5-6 cigarettes daily, had not consumed alcohol since 1996, and had used cocaine two weeks prior.  (D.E. 12-8, Page 76).   Plaintiff reported pain of 9 out of 9 in her knee which she described as constant and sharp.   (D.E. 12-8, Page 78).   Plaintiff reported she had difficulty sitting for any period of time due to her knee and back pain. P.A. Boostrom noted muscular weakness, especially in the quad muscles, and tightness in Plaintiff's back muscles.  (D.E. 12-8, Page 78).   P.A. Boostrom noted a slight crepitance in Plaintiff's knees with no warmth or effusion.  (D.E. 12-8, Page 78).   P.A. Boostrom

ordered a drug screen, recommending another appointment in four to six weeks.  (D.E. 12-8, Page 78).  Plaintiff was prescribed Celebrex for her joint pain and P.A. Boostrom indicated Plaintiff would be prescribed Tramadol.  (D.E. 12-8, Page 79).

On February 9, 2013, Plaintiff completed a function report reporting that she lived in an apartment with a friend, her leg, knee and hand ailments limited her ability to work, she cared for her pets taking them outside for about thirty minutes a day and bathing them monthly, and she could not sleep because of pain.  (D.E. 12-7, Pages 66-67).  Plaintiff further reported she cooked meals twice a week but could not stand for too long because her legs would give out.  (D.E. 12-7, Page 68).  She also stated she was able to clean the apartment twice a week without assistance and shopped twice a month.  (D.E. 12-7, Pages 68-69).  Plaintiff reported her knees gave out, her bones hurt, her legs hurt when she walked, she was limited to walking less than half a block and she could not open a can because of her hand ailments.  (D.E. 12-7, Pages 71 and 73).

On March 11, 2013, Plaintiff was treated by P.A. Boostrom.  (D.E. 12-10, Page 83).  Plaintiff is noted as having chronic neck and back pain and a history of chronic osteoarthritis at multiple sites especially in her knees.  Plaintiff is also noted as having increased left knee pain as an 8 and that her left knee was locking and giving out more often causing significant pain and there was chronic pressure sensation.  (D.E. 12-10, Pages 83-84).  Further, Plaintiff is noted as having a history of cocaine use in remission although her drug screen on February 2, 2013, tested positive for cocaine.  (D.E. 12-10, Pages 83 and 95).  P.A. Boostrom noted Plaintiff had a full range of motion of the cervical spine, tightness in several back muscles without significant spasm, severe

deconditioning and weakness in the lower extremities "especially the quad muscles," crepitus of both knees and slight swelling with no acute effusion or increased warmth. (D.E. 12-10, Page 84). An MRI was ordered. (D.E. 12-10, Page 83). Plaintiff's medications were refilled including Celebrex and adding Tramadol and a muscle relaxer. (D.E. 12-10, Page 83).

On March 14, 2013, an MRI was taken of Plaintiff's left knee (without contrast) and Dr. Jeffrey Bikle noted an undersurface tear of the posterior horn of the medial and lateral meniscus and a small joint effusion. (D.E. 12-10, Page 64).

On March 18, 2013, Dr. San-San Yu reviewed Dr. Post's December 10, 2012, RFC opinion and, after reviewing the record including Plaintiff's January and February 2013 treatment records, affirmed its findings. (D.E. 12-8, Pages 31 and 82). On March 19, 2013, Plaintiff's claim for benefits was denied upon reconsideration. (D.E. 12-5, Pages 15-20).[7]

On April 30, 2013, Plaintiff reported to a Nueces County MHMR staff member that she was doing better with her coping skills for her mental ailments and had been "hanging out with friends" and "gardening." (D.E. 12-9, Page 71).[8]

On September 3, 2013, Plaintiff was treated by P.A. Boostrom for left hand pain. (D.E. 12-10, Page 107). Plaintiff reported chronic hand pain at multiple sites, triggering

---

[7]Dr. San-San Yu reviewed Plaintiff's records as of February 1, 2013 and affirmed the December 2012 RFC as written. (D.E. 12-8, Page 82).

[8]Plaintiff was receiving "assistance with her symptoms due to severe depression." (D.E. 12-9, Pages 80-81). As stated previously, Plaintiff is not challenging the RFC regarding her mental ailments. While the undersigned has reviewed the entire record, only those notes relating to Plaintiff's physical activities and ailments are referenced.

of the left thumb, cramping and clawing of the hands, and a constant sharp pain in her left hand from the base of the thumb to the wrist.   (D.E. 12-10, Pages 107-108).   P.A. Boostrom further noted an MRI had recently indicated Plaintiff had an undersurface tear of the posterior horn of the medial and lateral meniscus as well as small joint effusion. (D.E. 12-10, Page 107).   P.A. Boostrom noted Plaintiff's records did not contain the laboratory results he had ordered in February and Plaintiff stated she had never gotten them done because she was too busy and her clinic card had expired but was now renewed.  (D.E. 12-10, Page 107).   After a physical examination, P.A. Boostrom noted Plaintiff's lower extremities showed "severe muscular weakness, deconditioning [and] weak quad muscles" with crepitus in her bilateral knees but "[n]o acute effusions…[or] increased warmth" and her "hands show[ed] significant deformity, especially the thumbs." (D.E. 12-10, Page 108).   P.A. Boostrom noted "chronic clamping of the hands" and a "tenderness to the base of the thumb deformity" which locked during the exam but he was able to "manipulate it easily and 'pop' into condition for her.  She had significant pain but could function better afterwards."  (D.E. 12-10, Page 108).   P.A. Boostrom concluded that this was a "Very difficult case.  Patient with noncompliance.  I would like to refer her to Ortho for reevaulation of the knee, possibly of her hands since they have become significantly more triggering."  (D.E. 12-10, Page 108).   X-rays of Plaintiff's hands were ordered, she was referred to occupational therapy and the orthopedic clinic, and Plaintiff was advised she needed to "be compliant with her visits." (D.E. 12-10, Page 108).

On October 31, 2013, Plaintiff was treated at Memorial for a rash and psoriasis. (D. E. 12-10, Pages 75-79).  Plaintiff reported her pain level as an 8 throughout her body. (D.E. 12-10, Page 75).  Plaintiff is noted as ambulatory and walking without an ambulatory aid and with a normal gait. (D.E. 12-10, Page 76).  Registered nurse Jake Bennett noted Plaintiff "ambulated to room from waiting room with steady gait."  (D.E. 12-10, Page 77).  Further, Plaintiff reported she did not have a history of falls.  (D.E. 12-10, Page 76).  Plaintiff was given medication for treatment of her skin ailments.  (D.E. 12-10, Page 77).

On February 13, 2014, Plaintiff was treated by P.A. Boostrom who noted Plaintiff had not been treated by him since September 3, 2013 because she "went down to the valley to stay [with her father] and "her boyfriend kicked her out."  (D.E. 12-10, Page 104).  P.A. Boostrom noted Plaintiff had a history of arthritis in multiple sites, chronic neck pain and multiple joint pains, a meniscus tear of the knees, and chronic left hand pain which made it difficult to carry things and to perform certain activities.  (D.E. 12-10, Page 104).  However, P.A. Boostrom also noted he had previously referred Plaintiff to occupational therapy and ordered x-rays of her hands and Plaintiff had not done either. (D.E. 12-10, Page 104).  P.A. Boostrom noted "poor compliance."  (D.E. 12-10, Page 104).  Plaintiff reported her pain level was a 4 in her left knee and her hands would lock and were stiff.  (D.E. 12-10, Page 105).  P.A. Boostrom noted muscular weakness, deconditioning, crepitus in the knees, stiffness in the ankles, joint tenderness as well as back muscle and wrist stiffness.  (D.E. 12-10, Page 105).  An x-ray of Plaintiff's hands was ordered, she was again referred to occupational therapy, and her prescriptions were

continued.  (D.E. 12-10, Page 105).  P.A. Boostrom noted "[w]e will hold off on Ortho evaluation until we get OT and x-rays and studies done."  (D.E. 12-10, Page 104).

On March 20, 2014, Plaintiff was treated by P.A. Boostrom.  (D.E. 12-10, Page 101).  Plaintiff reported significant pain in multiple joints, which P.A. Boostrom noted was evidence of osteoarthritis.  Specifically, P.A. Boostrom reported Plaintiff had "significant involvement with hands triggering."  (D.E. 12-10, Page 101).  Further, Plaintiff reported having increased back and knee pain and stiffness.  P.A. Boostrom noted Plaintiff "has chronic use" and noted she had a positive drug screen for cocaine and "does admit to using it."  (D.E. 12-10, Pages 101-102).  Plaintiff reported she could not afford the co-pay for frequent occupational therapy visits.  (D.E. 12-10, Page 102).  P.A. Boostrom noted an "[x]-ray of the left hand showed degenerative joint disease in a pattern consistent with osteoarthritis and an x-ray of the "[r]ight hand showed mild to moderate degenerative joint disease in a pattern suggesting osteoarthritis."  (D.E. 12-10, Page 102).  Plaintiff reported her pain was an 8 out of 9 "left greater than right knee and the hand and the lower back."  (D.E. 12-10, Page 102).  P.A. Boostrom's examination of Plaintiff's musculoskeletal system found tightness of Plaintiff's back muscles with a full range of motion of the cervical spine, chronic deformity of the hands with "some stiffness in the wrist," good range of motion in the ankles and shoulders, crepitus to both knees but greater in the left, and slight effusion in the left knee.  (D.E. 12-10, Page 102).  P.A. Boostrom noted Plaintiff needed an orthopedic examination for her left knee and prescribed bilateral carpal tunnel splints for her "significant pain in the hands and stiffness and pain during the night."  (D.E. 12-10, Page 103).

On June 2, 2014, at Plaintiff's request, a hearing was held before an ALJ at which Plaintiff and a vocational expert ("VE") testified.  (D.E. 12-3, Pages 27-56 and D.E. 12-5, Page 21).[9]  Plaintiff testified she had not had a driver's license in the past ten years, after it was suspended, and did not drive.  (D.E. 12-3, Pages 31-32 and 34).  Plaintiff further testified she lived with her boyfriend, was not working and had previously worked in hotel housekeeping full time.  (D.E. 12-3, Page 33).  Plaintiff testified she quit her hotel housekeeping position because, at the end of a workday, her hands would be swollen and she would have "to put them under cold water" "to start feeling them again."  (D.E. 12-3, Page 37).  Plaintiff stated she had been wearing wrist splints for between four and six weeks during the day prior to the hearing but they caused more pain, her wrists and fingers frequently became swollen, on an average day her pain level was a six out of ten, and she had approximately a week out of each month where her pain level was ten out of ten.  (D.E. 12-3, Pages 33-34).  Plaintiff also testified she alleviated her pain by using Aspercreme, massaging her wrists and fingers and taking Celebrex which gave her "lots" of relief.  (D.E. 12-3, Pages 35 and 38).  Plaintiff testified she mopped and cleaned the house once a week, her grip strength was weak, and she lost feeling in her hands every day for about an hour or two.  (D.E. 12-3, Pages 35-36 and 45).  When comparing the pain in her hands and wrists to the pain in her knees, Plaintiff stated her knees were more

---

[9]Dr. Sharon Rogers, a psychologist, also testified as to her opinion on Plaintiff's mental impairments.  (D.E. 12-3, Pages 30 and 51-53).  However, as Plaintiff is challenging the ALJ's determination as to only her physical limitations, the undersigned did not include this testimony in detail.  Further, as Plaintiff is challenging only that her knee, hand and wrist impairments further limited her RFC, the undersigned has not included the testimony or other evidence in the record discussing further physical limitations.  (D.E. 14, Page 5).  The undersigned has, however, reviewed the entire record.

painful and if she did a lot of walking, which she later defined as a half of block, her knees would give out and she had to massage them.  (D.E. 12-3, Page 36).  Plaintiff also testified she spent most of her days inside her house, reading or watching television while laying on her bed.  (D.E. 12-3, Pages 39-40 and 42-43).  Plaintiff testified she had previously been living and caring for her terminally ill father but had not done so for the past three years because he had been living in a nursing home. (D.E. 12-3, Pages 39-40).  Plaintiff stated she was capable of maintaining her own personal hygiene but had difficulty with buttons and laces, could cook simple meals, could lift and carry ten pounds, could stand for thirty minutes to an hour before needing to sit down and take a break and could not sit for thirty minutes without needing to get up and move around.  (D.E. 12-3, Pages 40-43).  Plaintiff further stated she used cocaine about a month prior to the hearing that was provided by her neighbor.  (D.E. 12-3, Pages 41 and 46).  Plaintiff also testified that on occasion she did not go to the doctor or get her medication because she did not have enough money to pay for them.  (D.E. 12-3, Page 46).

The VE, Donna Johnson, testified Plaintiff's past work was classified as a cleaner housekeeping (light and unskilled).  (D.E. 12-3, Page 54).  The VE then testified that someone of Plaintiff's age, education and vocational history who could lift and/or carry 10 pounds frequently, 20 pounds occasionally, stand and/or walk six hours in an eight-hour day, sit for six hours in an eight-hour day, could not climb ropes, ladders or scaffolds, and could only occasionally climb, kneel, crouch or crawl could perform Plaintiff's past relevant work.  (D.E. 12-3, Page 54).  The VE also testified that someone of Plaintiff's age, education and vocational history who could lift and/or carry less than

10 pounds frequently and up to 10 pounds occasionally, stand and walk two hours in an eight-hour day, sit for six hours in an eight-hour day, could stand for 30-60 minutes at one time, could not climb ropes, ladders or scaffolds, who could only occasionally stoop, kneel, crouch or crawl, and who could only occasionally handle bilateral upper extremities could not perform Plaintiff's past relevant work.  (D.E. 12-3, pages 54-55).

On July 22, 2014, the ALJ found Plaintiff, considering her degenerative joint disease of the left knee and bilateral hands as well as carpal tunnel syndrome,[10] had the residual functional capacity ("RFC") to perform light work with the following physical limitations:  lifting and/or carrying 20 pounds occasionally and 10 pounds frequently; standing and/or walking for six hours in an eight hour workday; sitting for six hours in an eight hour workday; no climbing ladders, ropes or scaffolds; and occasionally climbing ramps and/or stairs, kneeling, crouching or crawling.  (D.E. 12-3, Pages 12-3 and 15). The ALJ then concluded Plaintiff was capable of performing her past relevant work as a housekeeping cleaner and as such, she was not disabled.  (D.E. 12-3, Pages 21-22).

On August 6, 2014, Plaintiff requested the Appeals Council review the ALJ's unfavorable decision.  (D.E. 12-3, Page 6).  On October 31, 2014, the Appeals Council denied Plaintiff's request for review of the ALJ's determination.  (D.E. 12-3, Pages 2-5).

## V.   STANDARD OF REVIEW

Judicial review of the Commissioner's decision regarding a claimant's entitlement to benefits is limited to two questions: (1) whether substantial evidence supports the

---

[10]The ALJ found Plaintiff had other mental ailments, including substance abuse disorder, schizoaffective disorder, cognitive disorder, and depression.  (D.E. 12-3, Page 12).  However, as stated previously, the focus of this M & R is Plaintiff's physical impairment.

Commissioner's decision; and (2) whether the decision comports with relevant legal standards. *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*; *Richardson v. Perales*, 402 U.S. 389, 401 (1971). The burden has been described as more than a scintilla, but lower than a preponderance. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). A finding of "no substantial evidence" occurs "only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Johnson v. Bowen*, 864 F.2d 340, 344 (5th Cir. 1988) (citations omitted).

In applying the substantial evidence standard, the Court scrutinizes the record to determine whether such evidence is present. But the Court does not reweigh the evidence, try the issues de novo or substitute its judgment for that of the Commissioner. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994) (citations omitted). It is incumbent upon the Court to look at the evidence as a whole and take into account the following factors: (1) objective medical evidence or clinical findings; (2) diagnosis of examining physicians; (3) subjective evidence of pain and disability as testified to by the claimant and others who have observed him and (4) the claimant's age, education and work history. *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991) (citations omitted).

In evaluating a disability claim, the Commissioner follows a five-step process to determine whether (1) the claimant is presently working; (2) the claimant's ability to work is significantly limited by a physical or mental impairment; (3) the claimant's impairment meets or equals an impairment listed in the appendix to the regulations; (4) the impairment prevents the claimant from doing past relevant work; and (5) the claimant

cannot presently perform relevant work. *Martinez v. Chater*, 64 F.3d 172, 173-174 (5th Cir. 1995); 20 C.F.R. § 404.1520. The claimant bears the burden of proof on the first four steps with the burden shifting to the Commissioner at the fifth step. *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994).

## VI.   DISCUSSION

### A.   ALJ's Determination

In his July 22, 2014 decision, the ALJ followed the five-step sequential process determining that at step one, Plaintiff had not engaged in substantial gainful activity since August 1, 2011, the alleged onset date. (D.E. 12-3, Page 12). At step two, the ALJ found that Plaintiff's severe impairments included degenerative joint disease of the left knee, degenerative joint disease and carpal tunnel syndrome of the bilateral hands, depression, cognitive disorder, schizoaffective disorder, pain disorder, and substance abuse disorder. (D.E. 12-3, Page 12). At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity one of the listed impairments under the regulations and Plaintiff had the RFC to perform a modified range of light work. (D.E. 12-3, Pages 13-15). At step four, the ALJ found that Plaintiff could perform her past relevant work as a housekeeping cleaner. (D.E. 12-3, Page 21). The ALJ concluded Plaintiff had not been under a disability from August 1, 2011 through the date of the decision. (D.E. 12-3, Page 97).

### B.   Issue Presented

Plaintiff contends the ALJ's RFC finding that Plaintiff can perform a modified range of light work is not supported by substantial evidence. Specifically, Plaintiff

asserts the record does not support the ALJ's RFC finding that Plaintiff has the ability to perform work at the light exertional level with no manipulative limitations because (1) Plaintiff's left knee impairment greatly limits her ability to stand for any significant period of time and (2) Plaintiff's degenerative joint disease and carpal tunnel syndrome of the bilateral hands causes manipulative limitations.  (D.E. 14, Pages 4-5).

### C.  Analysis of Plaintiff's Claim

An RFC is an assessment, based on all of the relevant evidence, of a claimant's ability to do work on a sustained basis in an ordinary work setting despite impairments. 20 C.F.R. § 404.1545(a); *Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001).  RFC refers to the most a claimant is able to do despite physical and mental limitations.  20 C.F.R. § 404.1545(a).  The ALJ must consider all symptoms, including pain, and the extent to which these symptoms can be reasonably accepted as consistent with objective medical evidence and other evidence.  The ALJ is not required to incorporate limitations in the RFC that he did not find to be supported in the record.  *See Muse v. Sullivan*, 925 F.2d 785, 790 (5th Cir. 1991)("The ALJ as factfinder has the sole responsibility for weighing the evidence and may choose whichever physician's diagnosis is most supported by the record.")(citation omitted).

An individual claiming disability has the burden of proving disability and must prove the inability to engage in any substantial gainful activity.  *Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983)(citations omitted).  "The mere presence of some impairment is not disabling per se.  Plaintiff must show that she was so functionally

impaired by her [disability] that she was precluded from engaging in any substantial gainful activity.  *Id.*(citations omitted).

As discussed below, the ALJ performed a thorough analysis of Plaintiff's conditions based Plaintiff's subjective complaints and the objective medical evidence, which indicated that while Plaintiff was limited by her knee pain, degenerative joint disease and carpal tunnel syndrome of the bilateral hands, "the record as a whole [did] not support a finding that the claimant [was] unable to sustain work on regular and continuing basis due to her physical impairments."  (D.E. 12-3, Pages 15-21).  As a result, the ALJ concluded Plaintiff had the RFC to perform a modified range of light work.  (D.E. 12-3, Page 15).  Specifically, the ALJ found Plaintiff could lift and/or carry twenty pounds occasionally and ten pounds frequently, stand and/or walk six hours in an eight-hour workday, sit six hours in an eight-hour workday, and could occasionally climb ramps and/or stairs, kneel, crouch, or crawl and could not climb ladders, ropes, or scaffolds.  (D.E. 12-3, Page 15).[11]

Plaintiff argues the ALJ improperly relied upon the December 10, 2012 and March 18, 2013 opinions of the state agency non-examining physicians because these physicians did not have the opportunity to review Plaintiff's records from January 2013 to March 2014.  (D.E. 14, Pages 9-10).  Specifically, Plaintiff argues these opinions were rendered prior to Plaintiff's March 14, 2013 knee MRI which showed an undersurface tear of the medial and lateral meniscus with a small joint effusion and P.A. Boostrom's treatment

---

[11]The ALJ also found certain mental limitations, however, Plaintiff disputes only the physical RFC assessment.  (D.E. 12-3, Page 15).

notes which indicated leg muscle weakness and deconditioning as well as bilateral hand pain and impairments.  (D.E. 14, Pages 10 and 13-14).  However, a review of the ALJ's opinion shows he properly considered all of the evidence cited by Plaintiff, including both the March 14, 2013 MRI and the treatment notes of P.A. Boostrom[12] in detail.  (D.E. 12-3, Pages 15-18).  The ALJ summarized Plaintiff treatment history thoroughly and then set forth the inconsistencies in the record between the degree of severity Plaintiff alleged and the objective findings in the record.  (D.E. 12-3, Pages 17-18).  The ALJ concluded that the degree of impairment evidenced by the objective medical findings and the treatment record did not impose functional restrictions of physical disability severity on Plaintiff's activities.  (D.E. 12-3, Page 17).

As to Plaintiff's knee ailment, Plaintiff is correct that P.A. Boostrom's treatment notes in 2013 and 2014 indicate Plaintiff reported significant knee pain which caused deconditioning and muscle weakness as well as wrist and hand pain and associated decreased function. (D.E. 14, Pages 9-12).  However, while the ALJ discussed these findings, he also correctly noted the numerous instances where Plaintiff was reporting significant pain and limitations but was described as ambulating normally with a normal gait and a normal range of motion in her knees with normal strength and no associated

---

[12]P.A. Boostrom is not an acceptable medical source whose opinion can establish the existence of a medically determinable impairment.  *See* 20 C.F.R. § 404.1513(a)(acceptable medical sources who can provide evidence to establish impairments include licensed medical or osteopathic physicians and certain licensed or certified psychologists, optometrists, podiatrists, and speech pathologists).  However, the ALJ properly considered P.A. Boostrom's treatment notes pursuant to Social Security Ruling 06-03P which states that such information, as an addition to evidence from an acceptable medical source, "may provide insight into the severity of the impairment(s) and how the impairments affect the individual's ability to function."  *See* https://www.ssa.gov/OP_Home/rulings/di/01/SSR2006-03-di-01.html

weakness or exercise intolerance.  (D.E. 12-3, Pages 15-18; D.E. 12-8, Page 65; D.E. 12-9, Pages 5,14, 20 and 23; D.E. 12-10, Pages 5, 7-8, 39-40, 76 and 77).[13]  Also, when reviewing Plaintiff's March 14, 2013 knee MRI, the ALJ noted Plaintiff's later treatment notes showed an intact knee function with slight or no joint effusion, warmth or tenderness.  (D.E. 12-3, Page 18 and D.E. 12-10, Pages 103 and 107-108).  Further, the ALJ noted Plaintiff was discharged from prescribed physical therapy after only a few sessions for poor attendance in spite of having "significant reduction in pain after three visits, before not showing up for her appointments."  (D.E. 12-10, Pages 18 and 20); *Johnson v. Sullivan*, 894 F.2d 683, 685 n. 4 (5th Cir. 1988)(a person who fails to follow prescribed treatment may not be found disabled); 20 C.F.R. § 404.1530.

As to Plaintiff's bilateral degenerative disease and carpal tunnel syndrome, Plaintiff acknowledges "the evidence of record is scarce regarding Plaintiff's bilateral hand impairments prior to 2013."  (D.E. 14, Page 14).  While Plaintiff correctly details the treatment notes and her own testimony regarding her reported pain and limitations, the ALJ, when reviewing the entire record including P.A. Boostrom's treatment notes, also correctly found that x-rays of Plaintiff's left wrist on October 11, 2012 revealed only mild osteoarthritis and her physical exam showed normal motor strength and range of motion in her wrists, her most recent x-rays of her bilateral hands showed mild to moderate osteoarthritis, P.A. Boostrom's treatment on September 3, 2013, increased Plaintiff's hand functionality and, in spite of being referred to occupational therapy on

---

[13]The undersigned has summarized these records at length in the summary of evidence above as have both the Defendant and the ALJ.  (D.E. 12-3, Pages 17-18 and D.E. 15, Pages 6-14). Therefore, they will not be repeated here again at length.

this date, as of March 20, 2014, Plaintiff "still had not followed up on her referral for occupational therapy."  (D.E. 12-3, Page 18; D.E. 12-8, Page 20 and D.E. 12-10, Pages 102-105 and 108); *Johnson*, 894 at 685.

Plaintiff further argues that, in addition to improperly relying on the state agency physicians who rendered opinions prior to P.A. Boostrom's treatment, the ALJ also improperly relied upon "Plaintiff's failure to follow up on referrals for specialized treatment for her hands" because she "was wearing splints on a daily basis at the time of the hearing and she noted in March 2014 that she was unable to afford the copays associated with the frequent visits required of occupational therapy."  (D.E. 14, Page 14). However, the ALJ did not deny benefits based on Plaintiff's non-compliance with prescribed therapy but rather properly found that this noncompliance undermined Plaintiff's credibility.  *Robinson v. Astrue*, 2010 WL 2606325 at *8 (S.D. Tex. June 28, 2010)(*citing Villa v. Sullivan*, 895 F.2d 1019, 1024 (5th Cir. 1990)("A claimant's non-compliance with treatment is a proper factor for the ALJ to consider in assessing credibility.")  Further, as noted by Defendant, Plaintiff has failed to demonstrate she was indigent and could not comply with the referral to occupational therapy.  *Taylor v. Bowen*, 782 F.2d 12894, 1298 (5th Cir. 1986)(Plaintiff with a "medical condition that can reasonably be remedied is not disable[ed]" unless the Plaintiff "cannot afford the prescribed treatment and can find no way to obtain it"); *See Price v. Colvin*, 2014 WL 2611804 at *2-3 (S.D. Tex. June 10, 2014)(Claimant has not demonstrated he is unable to obtain a C-PAP machine by utilizing any free or low-cost medical services potentially available).  Additionally, on the same day Plaintiff told P.A. Boostrom she could not

afford therapy, a positive drug screen for cocaine is reported and Plaintiff did "admit to using it" for a period of time.  (D.E. 12-3, Page 19 and D.E. 12-10, Pages 101-102).  This further undermines Plaintiff's credibility about her inability to afford treatment.

It is the task of the ALJ to weigh the evidence.  *Hames*, 707 F.2d at 165; *Chambliss v. Massam*, 269 F.3d 520, 523 (5th Cir. 2001).  "It is not the place of this Court to reweigh the evidence, or try the issue de novo, or substitute its judgment…[i]f supported by substantial evidence, the Secretary's findings are conclusive and must be affirmed."  *Id*.  Upon review, the ALJ's determination of Plaintiff's RFC is based on substantial evidence.

The ALJ questioned Plaintiff at length, observed her during the hearing, thoroughly reviewed all of her treatment records and the opinions of both examining and non-examining state agency physicians.  The ALJ was not required to order additional consultative examinations or to obtain additional medical testimony in order to make a disability determination when the record already contained substantial evidence upon which to make a determination.  *Gonzalez v. Barnhart*, 51 Fed. App'x  484 (5th Cir. 2002)(the ALJ, who made numerous inquiries regarding [claimant's] medical condition and employment history, did not fail to develop the record by not ordering a consultative examination as a consultative examination was not necessary to enable the ALJ to make a disability determination).

Even though the record illustrates Plaintiff suffers from several impairments, substantial evidence supports the ALJ's conclusion that Plaintiff's impairments did not prevent her from performing light work with restrictions as identified in the RFC during

the time period at issue.  *Hames*, 707 F.2d at 165 (The "test for disability under the Social Security Act is not satisfied merely because Plaintiff cannot work without some pain or discomfort.  Plaintiff must show that she is so functionally impaired that she is precluded from engaging in substantial gainful activity")(citations omitted).

**VII.   RECOMMENDATION**

For the reasons discussed above, the undersigned respectfully recommends the ALJ considered all of the evidence in the record, both subjective and objective, and properly assessed Plaintiff's RFC.  As such, it is respectfully recommended that the Commissioner's determination be **AFFIRMED** and Plaintiff's cause of action be **DISMISSED**.

ORDERED this 3rd day of August, 2016.

_____
Jason B. Libby
United States Magistrate Judge

## NOTICE TO PARTIES

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel.  Within **FOURTEEN (14) DAYS** after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to 28 U.S.C. § 636(b)(1)(c); Rule 72(b) of the Federal Rules of Civil Procedure; and Article IV, General Order No. 2002-13, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendations in a Magistrate Judge's report and recommendation within **FOURTEEN (14) DAYS** after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court.  *Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415 (5th Cir. 1996)(en banc).